## TROY AND GREENFIELD RAILROAD COMPANY *vs.* HERVEY C. NEWTON.

At the trial of a case in the court of common pleas, the defendant objected to the plaintiff's right to recover upon the facts proved, and a nonsuit was entered; the parties agreeing, as was stated in the bill of exceptions, "that the various legal questions arising in the case should be submitted to the supreme court as upon a statement of facts." *Held*, that upon the hearing of the case in this court, no objection could be taken to the sufficiency of the answer.

Under an act of incorporation providing that the number of shares shall not exceed a certain limit, and shall be determined from time to time by the directors, no assessment can be laid until the number of shares is so determined.

A subscription paper for shares in a railroad corporation, which provides that assessments may be laid " when three thousand shares shall have been subscribed," does not authorize the laying of an assessment until the stipulated amount has been unconditionally subscribed, payable in cash.

Thus this provision does not include a subscription, by a contractor for building a railroad, of a certain number of shares, " being a portion of" a sum which, by his contract, was to be paid to him in stock at par, or, in case of any stock being issued by the corporation below par, then at the rate of the lowest issue.

So of a subscription to the stock of a railroad company, (who are authorized by their charter to connect at the State line with any railroad that may be constructed from a place in another state, or to take a lease of any such contiguous railroad,) upon condition that no assessment shall be made until that part of the railroad between the end of the line in another state and a certain place in this commonwealth shall be put under contract.

DEWEY, J. This action is brought upon the Rev. Sts. *c.* 39, § 53, to recover the balance remaining due and unpaid upon two shares of stock in the plaintiff company, the said shares having been sold at auction for nonpayment of assessments thereon. The case stated in the declaration assumes that the defendant had become a legal holder of two shares of the stock of the company, and as such was under the statute liable for the deficiency that had arisen. The question as to the nature of the action has heretofore been considered by the court. *Troy & Greenfield Railroad* v. *Newton*, 1 Gray, 544.

Various objections have been taken and urged against the maintenance of the present action. Of these a very prominent one is the objection that the directors of the company had not, previously to making the assessment, fixed the number of shares of which the capital stock of the company should consist. It was said on the part of the plaintiffs that this point was not open to the defendant, because not distinctly taken in his answer. But he does in his answer specifically deny " that the plaintiffs legally exercised their corporate powers, and in such manner as to bind the defendant "; and he denies " that he is liable for the amount declared for." See *People's Mutual Fire Ins. Co.* v. *Arthur*, 7 Gray, 267.

But if it be doubtful whether this precise defence is specifically stated in the answer, we still think this ground of defence is properly open before us. The case came to trial before the court of common pleas upon the auditor's report, and other facts agreed by the parties, including a reference to documentary evidence; and upon objection taken to the plaintiffs' right of recovery upon the case thus presented, if any objection was to be taken to the insufficiency of the answer to open the defence, that was the time and place to have done so. *Jones* v. *Sisson*, 6 Gray, 294. But instead of this, the case was there disposed of by a nonsuit; " the parties agreeing," as is stated in the bill of exceptions, " that the various legal questions arising in the case should be submitted to the supreme court as upon a statement of facts, and that thereupon the supreme court should make such disposition of the case and enter such judgment, order or ruling as justice should require."

We are then to examine and determine the question whether the omission on the part of the directors to fix and determine the amount of the capital, or number of shares, prior to the making of these assessments, is fatal to the validity of the assessment. The only provisions of the charter of the company in respect to this are that " the capital stock of the said company shall consist of not more than thirty five thousand shares, the number of which shall from time to time be determined by the directors thereof; and no assessment shall be laid of a greater amount thereon in the whole than one hundred dollars on each share." *St.* 1848, *c.* 307, § 4.

The present case does not in strictness fall within the cases where the amount of capital stock was fixed by the charter, as in *Salem Milldam* v. *Ropes*, 6 Pick. 23, and *Stoneham Branch Railroad* v. *Gould*, 2 Gray, 277 ; or those where the capital was fixed by the terms of the subscription books, as in *Cabot & West Springfield Bridge* v. *Chapin*, 6 Cush. 50, and *Atlantic Cotton Mills* v. *Abbott*, 9 Cush. 423.

It is a case of a charter, making provisions as to the capital stock or number of shares, fixing the maximum of the capital stock to which the company may be entitled, but beyond that leaving the precise number of shares from time to time to be determined by the directors of the company. In the provisions in the charter as to the maximum of the stock, and as to the determination of the number of shares from time to time by the directors, the present case resembles the cases of *Lexington & West Cambridge Railroad* v. *Chandler*, 13 Met. 311, and *Worcester & Nashua Railroad* v. *Hinds*, 8 Cush. 110. It differs from them both, as they do also from each other, in other circumstances.

From these cases however the principle may be derived, as applicable to charters of this character, that it is the duty of the directors in such case to fix and determine the number of shares from time to time. This number may be enlarged; but for the time being there must be a fixed number. This is strictly so held in respect to assessments upon shareholders, who are such by force of ordinary subscriptions to the stock.

In the case of *Worcester & Nashua Railroad* v. *Hinds,* 8 Cush. 110, such assessment, having been made before the directors had fixed the number of shares that were to compose the present capital stock, was held to be illegal, and an assessment that could not be enforced. That case is very direct, and would be decisi/e of the present case, independently of the form of the subscription paper signed by the defendant. Certain provisions or conditions are contained in the subscription, in the present case, as to the number of shares necessary to be taken and subscribed for before making assessments for constructing the road.

The case of *Lexington & West Cambridge Railroad* v. *Chandler,* 13 Met. 311, was a case of a charter like the present in the fixing of the number of shares by the directors; but it had the further provision, that the corporation should commence the construction of the road whenever two hundred and fifty shares should have been subscribed; and that number had been unquestionably subscribed. It was also found as a fact in that case that, prior to making the assessment, the directors had voted to close the subscription books of the capital stock. Upon these facts the assessment was held legal, the court dealing with it as a case where the charter had fixed the necessary number of shares required to authorize going forward with the construction of the road, and also finding, in the vote of the directors to close the subscription books, that they did thereby virtually fix and determine the present capital stock.

But the present case has neither of those elements, nothing in its charter indicating an authority in the corporation to proceed to the construction of the road upon a certain number of shares being subscribed; nor is there any direct vote of the directors, closing the subscription books. On the contrary, at the meeting on the 27th of December 1850, at which the directors, through the committee, made a computation of the number of shares subscribed, a committee was appointed to solicit further subscriptions to the stock; and, at the meeting held by adjournment on the 7th of January 1851, the directors were pursuing a similar course. The auditor reports that on the 5th of February 1851, when the first of the assessments sought to

be recovered was laid, the whole number of shares, in the various forms they had been taken, conditional and unconditional, was three thousand five hundred and fifty five, which much exceeds the number reported by the committee of the directors on the 27th of December 1850. It is apparent from the subscription books, that many shares were subscribed for between the 27th of December 1850 and the 5th of February 1851. The result is therefore that the report of the number of shares, as subscribed for in December 1850, was not a' closing of the subscription books, or fixing for the time being the number of shares of the company, and making that the basis of the subsequent assessment.

Taking the most favorable view of the present case, it lacks the two facts that existed in the case of *Lexington & West Cambridge Railroad* v. *Chandler*, 13 Met. 311, namely, the provision in the charter authorizing the corporation to proceed with the construction of the road when two hundred and fifty shares should have been subscribed; and a vote of the directors of the company, closing the subscription books.

So far then as this action is founded upon the provisions of the Rev. Sts. *c.* 39, § 53, and treating these shares as ordinary subscriptions for stock under this charter, and with no provision in the subscription paper that fixed the capital stock, or determined the number of shares necessary to be subscribed, it would seem quite clear that these assessments must be held invalid, for the reason that the directors had not pursuant to the charter fixed and determined the number of shares of which the capital stock should consist for the time being.

We have not overlooked the case of *Chester Glass Co.* v. *Dewey*, 16 Mass. 100. That case was more relied upon in reference to the question as to the organization of the company — a point not the ground of the decision of the present case. It may be thought, however, to have some bearing upon the question of the effect of the omission of the directors to fix the amount of the capital stock. That was an action directly upon the subscription paper. The plaintiffs were a manufacturing corporation, created under the *St.* of 1808, *c.* 65, which

provided nothing more than "that the property of such corpora-tions shall be divided into shares and numbered in progressive order." It appeared that the directors had made twenty nine shares, and there was no objection that they had not been numbered in progressive order. The principal question seems to have been, whether it was absolutely necessary for the defendant to have received his certificate, to constitute him a member and subject him to liabilities as such, where, through his own fault, he had not received it. The Rev. Sts. *c.* 38, § 9, are materially different as to manufacturing corporations from the *St.* of 1808, *c.* 65, requiring that the amount of the capital stock shall be fixed and limited by the company at its first meeting; and a more rigid rule would now be held as to thus determining the number of shares than was adopted in *Chester Glass Co.* v. *Dewey.*

It is said however, on the part of the plaintiffs, that, in the present case, it was not necessary for the directors to determine the number of the shares or fix the amount of the capital stock for the time being, before proceeding to make assessments, because the subscribers to the stock, by the terms of their subscription, agreed that when three thousand shares should have been subscribed, assessments might be made. We have not thought it necessary to enter upon the question whether, under the present declaration, the plaintiffs could rely upon that ground for an answer to the objection of the omission of the directors to fix the amount of the capital stock; but treat this question, as we have the defence to the action, upon the question of legal right upon facts stated by the parties. Assuming that the plaintiffs might have all the benefits they could have under an action brought directly upon the subscription paper, it then becomes material to ascertain whether in fact three thousand shares were subscribed for before either of the contested assessments was made.

The subscription paper signed by the defendant has the following provision : " When three thousand shares shall have been subscribed, the directors may levy assessments upon the same, provided that not more than ten dollars per share shall be

assessed upon each share at any one time, nor more than twenty five per centum of the amount subscribed, within any three months; and no subscriber shall be liable beyond the amount of his subscription, but to such extent the company shall have the power to enforce its claims against a delinquent subscriber by sale of his stock, and by process against him or his representatives." This was a form of subscription adopted by the corporators named in the act of incorporation. Their vote was " to adopt the following form of subscription," being that above recited, with other provisions not material to the point under consideration. This was the form of subscription under which the defendant subscribed for two shares, upon which assessments have been laid, for payment of which this action is brought.

Treating the stipulation in the subscription paper, above quoted, as the foundation of the action, and giving to it all the effect that the plaintiffs would claim as fixing the number of shares that must exist to authorize assessments, yet it leaves open the defence that three thousand shares were not subscribed; and that fact must be shown to exist before the defendant can be charged with these assessments.

What is the just and true import of the words " when three thousand shares shall be subscribed "? The form of the subscription paper which the defendant signed was that prescribed by the corporators. The condition must properly be taken to have reference to the same or substantially similar subscription papers. If any conditions or limitations were annexed to other subscriptions, they were not the subscriptions of shares to which we must suppose the defendant referred when he stipulated to pay an assessment made after three thousand shares should have been subscribed.

This subject was somewhat considered in the case of *Cabot & West Springfield Bridge* v *Chapin*, 6 Cush. 50, where it was stated in the subscription paper, " the capital stock to be in four hundred shares of one hundred dollars each," and the defendant, in defence of an action to recover the payment of his subscription, relied upon the fact, that of the four hundred shares alleged

to have been subscribed two hundred shares were, by the terms of the subscription, to be paid for in the stock of the Connecticut River Railroad Company, share for share, which latter shares were at a discount of seven per cent. below the par value. The court in that case held, that the four hundred shares required by the terms of the subscription to be taken were to be subscribed for, payable in cash or its equivalent, calculating the shares at $100 each, and that the defendants, having subscribed for three shares at that rate, had a right to expect that their associates should take their shares on similar terms with themselves, if they were to be held to the payment of their subscription. If they were shares subscribed for upon other terms, it was held "that they were not bound to treat such subscriptions as legal subscriptions, in making up the required number of four hundred shares."

With these principles for our guide, we are to inquire whether three thousand shares of the stock of the plaintiff corporation were duly subscribed for prior to the levying of assessments on the 5th of February 1851. This fact must be shown; and if not established, then there was no authority for making the assessments and enforcing their collection under the subscription paper, or by aid of its provisions as to the number of shares required to authorize assessments to be made.

The auditor has found that the whole number of shares subscribed before the 5th of February 1851, both absolute and conditional, was three thousand five hundred and fifty five. This reduces the question practically to this: Are there more than five hundred and fifty five of those subscriptions so affected by conditions and qualifications that they cannot be embraced in the class of subscriptions referred to in the subscription paper signed by the defendant? The auditor has with great clearness divided these conditional or qualified subscriptions into their appropriate classes. They differ very materially in the nature of their conditions. We suppose no one would doubt that the five shares subscribed for in Book No. 3, with this condition annexed, ' on condition that the road shall be tunnelled through the Green Mountains," was an absolute subscription on the 5th

of February 1851. There are others of small amount, equally obvious in their character.

But we have thought it more useful to consider the objections taken to some of the larger subscriptions, which, if well taken, will reduce the number of absolute shares below three thousand.

Among these subscriptions there are five hundred shares subscribed by Gilmore & Carpenter, under date of January 23 1851, with the following qualifying clause : " being a portion of the twenty five per cent. named in our contract for graduation." It appears from the report of the auditor that Gilmore & Carpenter, on the 4th of October 1850, made a contract with the plaintiffs for the graduation, masonry, &c. of certain portions of the proposed road, being Divisions Nos. 1 and 5 ; and that the Division No. 1 was required to be completed on or before the 1st of September 1852, and Division No. 5 on or before the 1st of July 1851. The contractors were to be paid monthly, on the engineer's estimate of the amount of work actually done, fifty per cent. of the contract price in cash, and twenty five per cent. in stock or bonds of the company, at the election of the contractors ; and, upon the completion of the work, the remaining twenty five per cent. in stock of the company.

This subscription was, it is obvious, not a cash subscription, and not a promise to pay any cash assessment on the same. The receipt of the stock by them depended entirely upon a contingency, as the contractors might fail to do the work and so no stock be earned. It was liable to be abandoned in whole or in part, and, as we understand from the auditor's report, the contract was not performed. It was by the terms of the contract stipulated that it might be put an end to "if Gilmore & Carpenter shall not on their part well and truly perform all the covenants herein contained." And it appears that the directors of the company, on the 4th of December 1851, voted " that the committee on construction be authorized to enter into any contract with Gilmore & Carpenter, that they may deem for the interest of the company, with reference to suspending the work on any portions of the road on the west side of the mountain," thus treating the contract as one that might be rescinded.

But another objection to this subscription as an absolute one, and having corresponding obligations to that of the defendant, is found in that portion of the contract made by said Gilmore & Carpenter, wherein it was provided, that the stock they were to receive in discharge of the contract was to be taken at the par value of $100 a share, "provided the corporation do not issue any stock for less than $100 a share, and in case any stock is issued at less rates, then the said Gilmore & Carpenter are to receive the balance due on the twenty five per cent. at the rates of the lowest issue." If their subscription was nothing more than taking the same as a portion of the twenty five per cent. named in their contract, it may be supposed to have reference to this qualification as to the stock to be taken by them. So far from being absolute subscribers of five hundred shares, they were subscribers with certain qualifications which rendered it entirely contingent whether they would assume the relation of stockholders in the company. They were by their contract to receive stock upon the performance of a certain contract. They did not agree in common with the defendant to pay all assessments that might be laid from time to time upon the shares of the stock. Now, however expedient it may have been to take this qualified subscription of Gilmore & Carpenter with a view to further the progress of the work, it cannot be treated as a subscription of the class embraced in the terms of the original subscription papers, by which the defendant and others agreed to be assessed whenever three thousand shares should have been subscribed.

The next class which we have particularly considered is that of the one hundred and thirty shares subscribed on the condition that " no assessment shall be made until the work is commenced, and that part of the road from Adams to Troy is put under contract." This condition, taken literally, makes this subscription for one hundred and thirty shares a subscription with conditions entirely differing from that of the defendant, being conditions precedent that have not been performed, and by reason of which it would be excluded from computation as a part of the thirty thousand shares required to be sub-

51 *

scribed before making assessments for the construction of the work.

The only answer to this is, that the parties could not have contemplated as a condition the putting under a contract work to be done beyond the line of Massachusetts, that being the extent of the plaintiffs' road. This suggestion is certainly entitled to consideration, but it is to be weighed with all the other attendant circumstances. The language of this condition, as found on the face of the subscription in Book No. 27, is, that "the road from Adams to Troy is put under contract." We find that upon Book No. 24 two hundred and twenty three shares were subscribed, upon the condition "that no assessment shall be made until that part of the road from Adams to Pownal line is under contract." It will be observed, as to this latter form of subscription, that where the purpose was to limit the condition to a contract for a road exclusively in the State of Massachusetts, the proper words were used to express that intention. The charter of the plaintiffs clearly indicates the purpose of a continuous line of railroad to Troy. The name of the corporation is "The Troy and Greenfield Railroad Company." Its location by the terms of the charter was to be "to some point on the line of the State of New York or of Vermont, convenient to meet or connect with any railroad that may be constructed from any point at or near the city of Troy." *St.* 1848, *c.* 307, § 2. Section 8 authorizes the corporation to "contract with the owners of any contiguous railroad leading into or from either of the States of Vermont or New York, for the use of the whole or any part thereof, or for operating the two roads conjointly, or for the leasing of such contiguous road, or for the letting of their own road to the owners of such contiguous road, or any other road which composes a part of the railroad line between Boston and Troy, of which the railroad hereby authorized shall be a part."

We perceive therefore reasons existing for treating this road as connected with a railroad terminating at Troy, and which may have induced the subscribers of these one hundred and thirty shares to have made it a condition of their subscrip-

tion and liability to assessment, that the road was put under contract from Adams to Troy. The subscribers for these shares having made it in terms a condition precedent that no assessment upon them shall be made until that event should happen, we do not feel at liberty to say that these shares can be computed as a part of the three thousand shares required to be subscribed.

The one hundred shares subscribed by James E. Marshall on the 10th of December 1850, are alleged by the defendant to have been subscribed in execution of his bond, and under the terms and stipulations of that bond, which were: " I do hereby subscribe for one hundred shares to the capital stock of said railroad company ten thousand dollars, provided the said railroad company will receive for payment of the same the following notes, payable to James E. Marshall or bearer, in charcoal, to be delivered on the bank of the North Adams Iron Company's furnace in Adams, at six dollars per hundred bushels." Then followed copies of five notes, for $2000 each, dated Adams, May 30th 1850, signed by Mason B. Green and Allen B. Darling, and payable " in good merchantable charcoal," as above, in one, two, three, four and five years respectively.

Assuming that the subscription and the bond are parts of the same transaction, the subscription of Marshall for the one hundred shares was clearly a qualified one, and not to be considered as an ordinary subscription. It stipulated for a delay in time of payment. The first note did not become due until after forty per centum had been assessed on the shares of the defendant, and the second note not until all the assessments were made, and the remaining three not for years after. The condition of this subscription was therefore not only to pay in merchandise, but to pay at a day future, and more remote than was required by the assessment on the defendant's shares. It was also to take an article of merchandise, not at its market value, but at a stipulated price, which might materially affect the amount to be realized therefrom, as it would be subject to all the fluctuations of price in the article during the period of five years. If this condition or form of payment is fixed upon the original sub-

scription, it would seem obvious that these one hundred shares cannot be computed as a part of the three thousand shares required to be subscribed. This written contract, of one date with the subscription, comes from the hands of the officers of the corporation. It was formally accepted by them by a regular vote of the directors on the 8th of July 1851, and the certificates of shares were then delivered to Marshall. Under all the facts, the inference would seem to be that the plaintiffs accepted this subscription in connection with the bond, and as a part of the same transaction, and thereby excluded it from the class of absolute subscriptions. If the decision of the present case turned upon this subscription, and there was any serious question intended to be made as to the connection between this subscription and the bond above described, we might have been disposed to hear the parties further upon that point. But as the subscription of Gilmore & Carpenter of the 21st of January 1851, and the subscriptions for shares accompanied by the condition that no assessments should be laid before the road should be put under contract to Troy, amount to six hundred and thirty shares, which number, deducted from the whole number of shares subscribed, three thousand five hundred and fifty five, leaves but two thousand nine hundred and twenty five shares, it is quite unnecessary to pursue this subject further.

The result is therefore, if we give full effect to the terms of the subscription by the defendant, as fixing for the time the number of shares, yet no liability has attached thereon, because the condition precedent of three thousand shares being subscribed has not been established by the proof. In any aspect of the case the plaintiffs must fail in maintaining their action.

*Judgment for the defendant.*

*R. A. Chapman & D. W. Alvord,* for the plaintiffs.
*C. P. Huntington & W. Griswold,* for the defendant.